Good morning, Your Honours. May it please the Court, my name is Bettina Shine, and along with my co-counsel Alan Futerfass, we represent the appellant defendant, Mr. Saavedra. As a matter of law, in this case, there was no false claim submitted for payment. CEDCO's payment for job placements was governed strictly by its contract with SBS. The contract provided that payment to CEDCO for performance-based compensation would be determined by SBS and validation by Charney was through Charney Research's telephone calls to all placed customers who answered Charney's detailed questionnaire about their jobs, about how long they have been at their jobs, about whether they've remained with the same employer for three months or six months. The results of Charney's validation surveys for contractual payment purposes was final. Neither CEDCO nor any other New York City workforce career center could contest Charney's results. Pursuant to a formula that SBS devised, SBS would determine the amount of performance-based compensation that CEDCO was entitled to receive on a quarterly basis, and then SBS would submit the claim for payment for the Work Investment Act grant funds. The only claim submitted in this case was by the defendant, Defendant's Exhibit T6, and that's at A908 of the appendix. T6 contains a cover email from SBS Quality Assurance, and it states, on March 24, 2010, payment authorization in the amount of $195,724.61 was submitted to SBS Fiscal Department for the following outcomes for CEDCO. Attached to that email is the authorization for payment memo submitted that contained the dollar amount and the date, and included with the payment memo was the records material to that claim, which is the Charney Outcomes and Validation Spreadsheet and the Charney Placement Report. When T6 was proffered by the defense, the district court said, it's irrelevant, but admitted it anyway. However, by the time of the charge conference, the district court agreed with the defense that T6, the quarterly claim for payment to CEDCO, was the only claim submitted for payment. Here, the government failed to put into evidence any claim submitted for payment, let alone a false claim. It was error as a matter of law for the court not to dismiss the false claim case at the 50A motion stage. We raised this issue from summary judgment throughout the trial, and this issue was raised again after the verdict in a letter to the court, and the letter made clear that, again, raised to the district court, the government did not introduce... Do you agree that's not a 50B motion? We didn't say the words 50B, but it was after the verdict, and we had the intent of 50B is for the court to consider other evidence or for the opposing party to put in other evidence. The evidence was before the court. We raised this issue that there was no false claim. The district court said that letter won't serve as a motion. Your Honor, if the court deems that there is waiver under 50B, we respectfully submit that manifest injustice warrants dismissal of both false claims actually. Let me, let me, uh... Pardon, Your Honor? At that point, you'd be subject to a higher standard, which you say is met. Yes, Your Honor, I would. Let me ask you, assuming that the quarterly internal calculation is the relevant claim as you're contending, let me review with you what I understand to be the evidence that the government says allowed it to carry its burden, and you tell me why it's deficient. Um, they introduced evidence that SBS would calculate CEDCO's performance payment on the basis of not only the Charney statistical sampling, but also by the total number of placements CEDCO claimed. Um, and so that meant that the more job placements it claimed, the more funds it could potentially receive, um, regardless of Charney's sampling results. So then we have a CEDCO employee who enters the intake data who testified that she falsely, or she falsified the job information about half the time. Um, there's your direct report, Saavedra's direct report, which stated that during the majority of his tenure, CEDCO never met placement targets without using false data. And then his administrative assistant stated that Saavedra personally directed her to enter false placement data. Now, if we assume, as we have to, that the jury credited all that evidence and drew the inferences that, you know, it could admit favorable to the government, why isn't that enough? Help me out. Certainly, Your Honor. Well, the district court who heard the witnesses testify found that the witness, the government's witness's testimony was not, quote, not sufficient. And that's at 8. Well, that's not the issue for us. I mean, we're doing de novo review on sufficiency. So you tell me why the jury could not, presented with that evidence, make the culpability finding. Well, first, because the, um, the Charney research formula and SBS's formula pursuant to the contract, which would determine what the quarterly payments would be, provided that, if, provided for a number of total placements and verified placements. If the number of verified placements fell below 50 percent, CEDCO would get no money for performance-based compensation. If it fell within 50 to 75 percent, they would get something less than the total amount they could receive. So SBS, which administered the Work Investment Act funds, decided that there was, there had to be a formula because some valid placements would not be counted because when Charney research telephoned the people placed in jobs, some of them, uh, wouldn't answer the, the, the calls because they were working at, at restaurants or other places in the evenings and on weekends. And as well, some didn't have phones, some changed their phone numbers and some moved. You know, many of these people who the Workforce Center served had other, uh, issues. Some were transitioning from public assistance. Others had, had other needs that the Workforce Center also served for them. So we're focusing on the performance-based compensation part of the contract for CEDCO. Great. I'm not following you. You're telling us it's difficult, uh, in some instances to get an accurate determination. Is that what you just said? Uh, no, Your Honor. If I— You said they moved or they don't answer the phone. If I may, if I, I don't raise— It's difficult. Well, I raised that to, to show that SBS in, in determining how they would award— I'm, I'm trying to understand you. It's difficult to get it accurate. Is that what you're saying? Well, I raised that fact to show that some people— Is that what you're telling us? It's difficult to confirm places at some— Okay. Granted that it's difficult, is it a fact that in this record there is evidence that some records were false? No, Your— Some records. No, Your Honor. No record is false in this record. But if I may, because this is a False Claims Act case and— I'm not asking is the record a claim. I'm asking whether you think some records were false. There may have been a false job placement put in, however— Okay, that's, all right. So now the question, I think, at least for me, is going to become whether the making of some false records is sufficient to support conviction under a False Claims statute. Your point is it doesn't. Okay, but to tell us that how difficult it is doesn't really advance it when in fact there are some false records, right? Respectfully, Your Honor, there may have been false, there may have been, but it's conjecture because the government didn't— On this record we don't know some are false? Your Honor, the Department of Investigation, Investigator Sung, reviewed 10 bankers' boxes of CIF, customer information forms, and tried to prepare a report determining what happened here. We have testimony from the person who prepared them that she falsified job information 50 percent of the time. Now on sufficiency review, I don't know how we do anything other than assume that the jury credited that. I understand that you have an argument that it wasn't corroborated, that there would be reason to doubt it, but on sufficiency review, we're obliged to think that that was credited, aren't we? Your Honor, the jury returned a finding of 13 false records. The testimony was 50 percent of the time. Had that been true, SEDCO would receive— They can believe in part, not in part. Your argument to us is there's insufficient evidence, and I find that difficult when there's direct testimony from someone who personally says she falsified the documents. Most respectfully, Your Honor, if her testimony was true, then SEDCO would have received no performance-based compensation payment because the validated placements would have been below 50 percent. So your argument is there was too much evidence? My argument that the evidence—the government's evidence was not credible. The court found a failure of proof, and I understand the review, but— It was not credible as a matter of law, because that's what we would have to conclude here, right? The district court found that. The district court said there was a failure of proof, and he limited the jury's consideration of the False Claims Act to 2011 because the witnesses testified about 2009 and 2010, and he found that their testimony was not sufficient as a matter of law, so he didn't credit it. He just looked at the DOI report, and that report indicated that Ms. Sung, who was the author of the report, said there were 528 false placements, but she couldn't confirm whether any of them were verified, which would have made them eligible for payment. The issue is not the false—if there was a false placement put into the work source, the data, that would not have been verified. It would have been booted out by the Charney verification process. So, our contention is, those would be—the data, if there was a false placement put in, is not a record material to the false claim, because it never made its way into the false claim, and because Charney verified all placements, it could not have made its way there. Yes, thank you, Your Honor. May it please the Court, my name is Ellen Blain. I'm an assistant U.S. attorney here in the Southern District of New York, and I represent the government in this case. The judgment should be affirmed. My opposing counsel mentioned a number of points, but let me just say as an initial matter that the defendant does not contest that there was fraud. Indeed, the defendant heard his own staff admit openly in court to the jury that they routinely, as Your Honor noted, submitted false placement information to the government. The defendant also does not dispute that he knew about the fraud. Nor does the defendant dispute that had the government—rather, that once the government learned about the fraud, the government canceled its contracts with CEDCO. Okay. So, as a result, the jury accurately found false claims act liability against this defendant. This is a statute that punishes the making of a claim, and your recitation just now never even mentioned a claim. So the claim in this case, Your Honor, is the data that CEDCO staff submitted to the government in WorkSource One. Because every time CEDCO staff said— The claim is a data? That's right. The claim does not have to be an invoice. It doesn't have to be in paper. This is the only request for payment that CEDCO made. What piece of paper are we talking about? There was no piece of paper. The only information that CEDCO sent— What is the thing, electronic, documentary, whatever, that is the claim, in your view? The thing is the electronic submission. Who prepared that? CEDCO staff. Not the defendant? Well, the defendant's staff prepared it. But, yes, the defendant's staff, at the direction of the defendant, told them to enter false information into that database. And that— But you didn't charge them with conspiracy, which I think would have been a lay-down hand. They certainly conspired to have false claims committed. You didn't even charge them with aiding and abetting, did you? You charged them with submitting a false claim. That's right. And either submit or causes to be submitted. That's the False Claims Act definition in A1A. The defendant here, the jury found— Did it go to the jury on that theory? Yes. I thought your theory was they submitted a false claim, not that they caused it. It doesn't say they caused it. It says they influenced it. That's an odd word if you've got a cold case under causation. Well, the defendant, pursuant to the false claim, quote, This is a straightforward CEDCO staff said to the government, I helped John Smith get a job. And they said that in the only way they could, which was through the database. But CEDCO lied and didn't actually help John Smith get a job. And CEDCO routinely told the government that it helped many John Smiths get jobs. Benefact didn't. You keep talking CEDCO, and you've got an individual defendant. Yes. And, Your Honor, first of all, the defendant is not challenging on appeal the sufficiency of the evidence about his role vis-a-vis the fraud. He's only challenging on appeal, although, of course, we argue that it's waived, but even if it's not waived, that a false claim was submitted to the government. Not his actions vis-a-vis the false claim. He's only arguing what the false claim is itself. And the false claim, the government argued to the jury, was this data submission because that's the only thing that defendant could have submitted to the government to get anything. And that's all the government requires in order to get payment, in order to issue payment? That's right. That's right. That's the only thing that CEDCO staff submitted that defendant submitted in any way to get payment. I'm not asking you what they did. Is that all the government requires in order to cut the check? Yes. In order to issue payment? Yes. Because at the end of the day, CEDCO submitted multiple false placements into this database. SBS, the government grantee, looked at that database on a daily, weekly, quarterly basis, and every quarter extracted all the John Smiths that CEDCO said they placed. They then sent that list to a— SBS did. SBS did. Not CEDCO. Not CEDCO. So SBS sent to the government for payment something in electronic form. No, Your Honor. I'm sorry. No. All right. Then help me understand. Okay. Exactly. Let's start from the receiving end. What did the government get? The government got nothing of tangible value, ultimately, from the defendant. What did they get in data form? That's what I'm going to say. What did they get that's the claim? They got the data submission from— In electronic form. In electronic form. Was it a disk, a tape? Just tell me exactly. It's a live database. It's a live database. So imagine that there's an Excel spreadsheet that both Your Honor can access, excuse me, and I can access at the same time. It's a database on someone else's server? Yes, on the city's server. How does the government know to look at it? Because it's the government's database, and the government— The government's own database. It's the government's own database. And they look at it periodically to see what data is in there that entitles the claimant to money. That's right. Is that it? That's exactly right. All right. And then how mechanically does SDS—is it SDS? SBS. SBS. Put the data in. What do they do? They go to a computer and type in? SBS doesn't put in any data. That's the city. Who put it in? Only CEDCO. Only CEDCO. What does CEDCO do mechanically to put it in? So it opens up the spreadsheet and says, I placed John Smith in a job at Safeway, and I got him that job after he came to me for help. So there are two fields, or multiple fields, but only two that are relevant. One is, is he a placement? Yes. And another field, why is he a placement? Because I falsified the start date, for example. That is what goes to the city. The city looks at that information all the time, but every quarter takes out all that information and sends the list of people CEDCO claimed to help to this third-party auditor, Charney Research. Charney then does a quality control, statistical sampling of those people. So it decides to try to contact a certain percentage of the people that CEDCO claimed to help. It doesn't actually talk to every single person it tries to contact, nor does it try to contact everybody on the list. It only talks to a portion of the people on that list. Then it tells the city, okay, I've determined that 40% of this is fine, some percentage of it is fine. The city then takes that report and the total claimed placements that they originally got from the WorkSource One database, from that database, puts those two things into a formula, and out comes a dollar figure. That's the dollar figure that CEDCO gets paid. So now I thought from your brief you were saying that their false record was the claim. You're not saying that now. No, I'm saying... Quite different. You're saying the preparation of that false record is what caused somebody else to present a false claim. Is that it? No, it's the false claim and the false statement. The reason that's a little bit confusing in this case, Your Honor, is because we're dealing with a database. That's it. No paper document, no invoice that's created formally. I don't know. I don't think my question had anything to do with paper or electronic. The defendant electronically didn't submit anything for payment. Right? It's actually not clear, Your Honor. There was evidence that he did actually go into the database and submit claims himself. The evidence show that? The evidence showed that he instructed other people to do it is mostly what the evidence showed, Your Honor, and that's throughout the entirety of the trial. The multiple witnesses testified. Could you give us references where the defendant instructed staff to put false data into the very database from which the government made payment? Yes, Your Honor. Could you give us those references either now or in a subsequent order? Yes, Your Honor. I'm happy to do it right now. Okay. So the government put in, and this is the defendant's appendix, rather, 164-66. 64-66. 164-66. Exactly, Your Honor. And he personally directed her. That's right. And that is the evidence of his personal direction to put false information in the database. And when you say the database, is that the database you just described to me from which the government makes the payment? That's this Excel spreadsheet? Yes. That's the only way that anybody requested payment from the government is through this database. That's the only thing. The record is WorkSource 1. That's right. It's the government's database. They named it WorkSource 1. Then I guess I have a lot of trouble knowing why you tell us in your brief they influenced it if now you're telling us they didn't. That doesn't sound like influencing. That sounds like putting false data into the government's database and making a claim. Maybe influence was too kind a word to the defendant, Your Honor. The other possibility is it was more accurate. No, Your Honor. The evidence shows the defendant caused false information to be put into that database because. . . But now you're back to causing. A minute ago you said, no, no, no, never mind causing. They did it. At those three pages, I'm going to find out where they actually put it into the database. Well, there's more than that, Your Honor. I think there are two questions. I don't need more. If they did that, as far as I'm concerned, you win. But I took from your whole brief that, no, no, no, it's just records. It's not a claim. It's records. And the records influence the making of the claim. Because the records and the claim, in this case, are exactly the same thing. And I think that may be why we're hung up. You said that in your brief? Yes, Your Honor. And we say that at pages 35, 30 to 35. My correct understanding is what we have here is the government, always helpful, does not demand that anybody say, I claim X amount reimbursement or I claim X amount payment. Instead, all you have to do is enter the data in this spreadsheet, and the government itself uses it and writes the check to you. That's right. And that's why, after this process and after the government determined that so many false placements were submitted for payment, canceled the contract with SECO and redid this process. It's not our issue, but everything to help fraud along. Right. It was not the best plan, Your Honor, and, therefore, it was ripe for fraud. It was ripe for bad apples to put in false information to try to get money that they didn't deserve, and that's exactly what the jury heard here. Is WorkSource 1 the name of the Excel spreadsheet? Yes. Yes. There was more than sufficient evidence in the record, Your Honor, for the jury to conclude that the defendant submitted or caused to be submitted this false placement information. Finally, there's more than enough evidence in the record to suggest that the defendant knew about the fraud, nor, as I said initially, does defendant dispute that he knew about the fraud. And the evidence of the fraud was rampant, and I just want to give the Court a couple of sites because I know Your Honor asked about this. There's also evidence that Mr. Saavedra presided over staff-wide meetings at which this fraud was openly discussed. That's at 159 to 160. There was evidence that this was discussed openly throughout the WorkForce 1 centers of which he was a director. That's at Appendix 160 and Plaintiff's Appendix 30 to 31. There's evidence that his direct report, Alan Katz, told his employees to routinely submit false information. That's at Plaintiff's Appendix 17 to 18, 24, 34 to 43, 52 to 57, 72 to 80, 86 to 91. There's evidence that the defendant's own employee routinely submitted false information in the database almost 50% of the time. That's at Appendix 345 to 50, and the list goes on. The evidence here of fraud is rampant. There's more than sufficient evidence for the jury to have concluded, as they accurately did, that false information went to the government. Thank you. Can I ask you one other thing about what you say in your brief at 33? Thus, the number of total placements in WorkSource 1, regardless of whether that total included false or accurate job placements, directly influenced how much of the performance milestone payment SBS would pay. Right. So you're saying even if they were accurate, there was a false claim? Yes, because false claims reach attempts to pay out, attempts to get the government to pay out funds. But you're saying even if whether they were false or accurate. Right. So that is just describing the contracts, Your Honor. The contracts provide that CEDCO, again, is paid based on a formula, and one of the inputs is the total number of people they claim to help. And so the more they claim to help, the more they were entitled to get. That's true, regardless of whether or not they actually helped the people. Oh, so that's just— That's just the contracts. That's not your claim. That's just describing how it works. Exactly. Before you sit down, you have now spent a lot of time explaining to us the data entries. But, of course, the defendant's theory was that it was not the data entries but these quarterly submissions that had to be the claim. And you argued to the jury that whether they thought the claim was coming through WorkSource 1, this data, or whether you view it as some sort of compilation of those payments, it amounts to the same thing. Tell us how the compilations were created, by whom, and how that would be enough to support the verdict. So the compilations were created the end of every quarter, as I was just telling Judge Newman. SBS looked into the database, extracted all the John Smith CICO claim to help, and sent that list to this third-party contractor, Charney. Charney sampled, tried to contact some of those people, not all of those people on the list, and then told SBS what that percentage verification was. SBS takes that percentage verification, puts it in one input, takes the total claim placements that CICO said, based on that data in the Excel spreadsheet, puts that into the formula, and then out pops the number that CICO was paid. That's at the appendix, at defendant's appendix 908. There are three sheets of paper in that, Your Honor. One is the cover email from SBS finance department to another SBS finance department person saying, here's the attached. Attached is the formula that I just described, showing the total number of placements and Charney's verification are the same. So the data they put in doesn't result in payment until a third party supplies a percentage to be applied to that data. Is that it? That's right, and that's based on the same false data. It's all incorporated in the same thing. And to the extent that the government— That's what comes from CICO and the defendant. That's right. And to the extent, Your Honor, that the government needs to show that the government actually paid for any of these false claims, which is vital to note, is nowhere in the statute. The Supreme Court has said in Neffert-White the government doesn't have to show that it actually paid for any false claim because the False Claims Act is designed to reach any attempt to fraudulently pay out from the government fisc. This would be so much simpler if you had charged them with conspiracy to file a false claim. I'll take that back to my supervisor, Your Honor. Next case. But finally, even if the government had to show, and this gets to Judge Raddrey's question, that the government actually paid for any of this false information, if you could look at Defendant's Appendix 859, it's an email among the city employees trying to determine what happened. And they determined that 401 false placements were sent to this Charney contractor and that Charney actually said, yes, 13 of them are fine. So even if we had to show that the government paid for any of this, we did. As a matter of fact, the SBS Deputy Commissioner, whose job it was to review the contracts and employ the contracts and look at these calculations, testified that they determined that at least one of these false placements went into the database, back to Charney, and then Charney said, yes, that was okay, and got put back into the formula, and the government paid out. There's ample evidence in the record for the jury to conclude that false information was in those quarterly statements. It was testified to, and the document shows it. Thank you. Thank you, Your Honor. You've well passed your time. Ms. Schein. Thank you, Your Honor, if I may. First, there's a charging error. The government conflates records and claims. The Statute B and A of 3729, you have to have a record material to a false claim. It's a double falsity standard. Here, the government's conflating both. You wouldn't have two statutes if the data entry is the claim as well as the records material. Well, what do you do? I'm sorry. Or did your client and CEDCO have to submit in order to be paid other than the data? Most respectfully, Your Honor, there was a contract which governed payment to CEDCO. The contract was between SBS, which administered the Work Investment Act funds for the city, and CEDCO. I understand that, but what more did your client have to submit in order to claim effectively, and we'll use the word colloquially there, that it was entitled to be paid? My client. I mean, the government says nothing more than the data was required of CEDCO. Do you disagree with that? And if so, what else do you think you had to submit? My client didn't submit anything. He was the director of the center, and, Your Honor, if I just may say that— What else did CEDCO have to submit other than the data? CEDCO had to input job placement data into WorkSource. The answer is nothing else. That was all you had to submit? Your Honor, in order to receive payment? Right. That's not all. That CEDCO had to submit. I understand there were other players, SBS and others, but what more was required of CEDCO? Required of CEDCO, nothing more, but the contract required that all placements be verified for contractual payment purposes. I get that. It had to be verified, but once you put it in and it's available to be verified, and you know that to the extent it's verified, there's going to be payment. Right so far? To the extent it's going to be verified, it's going to be paid. Right? Yes. All right. Then why isn't putting the record in causing the presentation of a false claim? Because if the job placement record is false, it won't be included in the verified placement. But the evidence showed that a lot of them were verified. Your Honor, most respectfully, if, as the government says, there was rampant fraud there, then CEDCO would receive no payment because if the percentage Well, maybe it wasn't rampant. Maybe it was only 50 percent. Maybe it was only 10 percent. Even if it was 50 percent, Your Honor, they would receive no payments. SBS determined a percentage basis based upon the number of verified the performance review was done, the government paid money. Right? They paid pursuant to the contract. Yes, based on records, some of which were false, and therefore there was causation. No? Most respectfully, Your Honor, the government proved not a single false placement was paid for. I mean, they didn't link it up. That is? They didn't link it up, and there wasn't proof. There was testimony from Ms. Thompson. Is this a tracing problem? Is that what you're talking about? No, Your Honor, it's not a tracing problem. There's two issues here. The jury was never instructed as to what was the claim. The claim is the submission for quarterly payments. The claim is not the data entered into WorkSource. I think I'm with you on that, that the claim is what ultimately goes or the government extracts for payment. I'm asking you whether or not the jury was entitled to find that your client caused that to happen. Your Honor, most respectfully, in my view, no. The jury requests a readback of William Harper's testimony. William Harper didn't testify live. He was the whistleblower in this case. His role at the Workforce Center was as the strategic operations coordinator. His role was data integrity. He reviewed all the live data in there. He testified. He didn't testify live. We brought him in from Berlin for deposition, and then his testimony was read at trial. He testified that he had no knowledge that there were false placements being put into WorkSource. I don't care whether he knew it. He was in charge of all the— Your client knew it. There's no evidence my client knew it. And this evidence, your client directed it. Most respectfully, Your Honor, most respectfully— Look, I understand you don't credit this testimony, but it's testimony. I mean, when you say there's no evidence, there was a witness who testified that your client directed the filing of the false data. Your Honor, I respectfully refer the court to the district court's finding that there was no evidence as to the government's witnesses. All right. Thank you very much.